## ANDINO v. DONOVAN et al.
### Civ. No. 4890.

District Court, Puerto Rico.

March 12, 1948.

Carlos D. Vazquez, of San Juan, P. R., for petitioner.

Philip F. Herrick, U. S. Atty., of San Juan, P. R., for Deputy Commissioner of Federal Security Agency.

Wilson P. Colberg, of San Juan, P. R., for San Juan Const. Corp. and Eagle Indemnity Co.

CHAVEZ, District Judge.

This matter comes before this Court for decision upon defendants' motion to dismiss the petitioner's bill for injunction.

The motion alleges that the findings of the Deputy Commissioner P. J. Donovan are supported by evidence.

The Deputy Commissioner who heard the witnesses and conducted the investigation of the claim for compensation rejected the same, and thereafter petitioner Maria Andino, on behalf of herself and others, filed a Bill for Injunction to set aside the order rejecting the award and to award petitioner the compensation. It is to this bill of injunction that the motion to dismiss is addressed.

Susano Andino died on January 8, 1946. He had gone to work for the San Juan Construction Corporation at 7:00 a. m. that day. He was a laborer working in the quarry and had worked at said quarry for about two years. About 9:00 a. m. on January 8, 1946, Andino, while barring a large stone weighing about 700 or 800 pounds, fainted and fell. He was taken to a hospital, where he died at approximately 10:55 a. m. that same morning.

It is conceded that the only issue before the Court is whether the findings of the Deputy Commissioner are supported by substantial evidence.

The findings of fact by the Deputy Commissioner as to the cause of death are as follows:

"That on the 8th of January 1946, the deceased herein was standing in a quarry barring loose stones from the face of the quarry with an iron bar and that approximately 9:00 a. m. on that date, he collapsed and the bar slipped from his hands; that prior to, during and subsequent to the collapse, the employee did not sustain an injury arising out of and in the course of his employment"; and further found "that the employer furnished the injured employee first aid treatment at the work site, after which he was removed to the Municipal Hospital, Rio Piedras, Puerto Rico, where he died of coronary thrombosis at 10:55 a. m. on January 8, 1946."

The final conclusion of the Deputy Commissioner rejecting the award states "upon the foregoing facts, it is ordered by the Deputy Commissioner that the claim of Maria Andino for death benefits be and it is hereby rejected for the following reason: the death of Susano Andino on January 8, 1946, did not result from an accidental injury arising out of and in the course of his employment."

A review of the evidence shows that Susano Andino, a man 39 years of age, had suffered from a heart ailment for many years, possibly five or ten years, and during the last six years he frequently complained of fatigue and trouble on his left side of his chest; his feet were often swollen and during the year prior to his death he complained about once a week but never sought medical assistance but relied upon his wife's home remedies; during the week before his death Andino had been having severe pain and the night before he died he was feeling sick.

Dr. E. Ramos Elvira, who examined the deceased about 9:15 a.m. on January 8, 1946, testified that when Andino was admitted to the hospital he had a very severe pain in the epigastric region (explaining with a gesture the upper abdominal region but below the sternum). The testimony of Dr. Ramos follows:

"Q. Did you observe any other symptoms in this patient? A. I was visiting other patients when he was brought in and the patient was seen by Dr. Janer, who called me. I examined him and made a diagnosis of the symptoms and I diagnosed coronary thrombosis. During the short time he was there the blood pressure was taken and it was 100 systolic over 60 diastolic. What else do you want to know?

"Q. What other symptoms or conditions of the patient did you observe to bring you to the conclusion that he died of a coronary thrombosis? A. Due to the pain he had I thought it was some stomach trouble and I made a study to see if a surgical intervention was necessary or if it was an acute condition of the stomach to make a different diagnosis. Then I examined the heart with the stethoscope. I found in the aortical focus a diastolic murmur and the apex of the heart was beating to the 7th left intercostal space over the anterior axillary line. In the pulmonary basis I found some crepitant rales. On palpation of the abdomen I found an enlargement of the liver and some ascitic liquid. By palpa-

tion in the extremities I found a pulse of 122 per minute and edeman in the lower extremities. Temperature was .2. He had dyspnes or anxiety. Enlargement· of the veins of the neck due to pressure of the blood from the head. Also found enlargement of the heart shadow at the apex of the heart, specially the left ventricle. The patient was in the hospital about 15 minutes, then he died.

"Q. Will you please tell us how a coronary thrombosis is produced? A. A coronary thrombosis? Coronary are the veins and arteries that carry the blood from the heart. And a thrombosis is an occlusion of these arteries and veins. It is produced when a thrombosis obliterates one of these arteries resulting in the occlusion of these arteries and leaving a part of the heart without blood. The itiology of this may be due to aortitis, an aortic ulcer, a degeneration of the myocardium, a difficulty in the circulation of the coronary blood.

"Q. Doctor, is this coronary thrombosis a sudden disease? A. Yes, a sudden disease but not the cause of the thrombosis, as an aortitis can be of a long standing or the patient can have a difficulty in the circulation of the coronary blood for a long time and one day have a thrombosis.

"Q. So you state that the coronary thrombosis is due to a previous condition of the heart. A. Yes, sir. No normal heart can have a thrombosis.

"Q. Doctor, from the examination you made of this Andino, can you state if this man had a previous heart illness? A. Yes, I can assure that as a physician, in 15 minutes that I saw him.

"Q. All right, then Doctor, for how long do you think this man had been suffering? A. I cannot answer that question. Maybe 10 years, 5 years.

"Q. Or one day, two days? A. No, not even a month. It takes time for all that process to develop. I say that I found in the heart, with the stethoscope, a diastolic murmur in the aortic focus and a diastolic corroborates an insufficiency of the aortic. And one of my final diagnosis, not the one that caused the death, was aortitis, although I did not determine the etiology of the aortitis.

"Q. For how long do you think this man had been suffering from aortic insufficiency? A. It cannot be determined.

"Q. Can it be two months? A. No.

"Q. You said the process is long? A. Yes, I say it needs time. I say this man had a chronic heart trouble.

"Q. And this was a condition which cannot be developed in two months? A. No, I can assure that the aortic insufficiency cannot develop in two months.

"Q. So this is a question of years? A. Of time. My final diagnosis: A coronary thrombosis that caused a cardiac infarction in a patient suffering from aortitis with aortic insufficiency.

"Q. Doctor, suppose this man, Susano Andino, for many years had been suffering from pain in the left side of his chest, just upon his heart, that for some time this man had swollen ankles and fatigue and that this man Andino, the day he died started to work at 7:00 a.m. he was trying to remove a stone that weighed about 700 or 800 lbs., that he suddenly fell down when he was making an effort, when he was pushing this big stone and that they found this man died from coronary thrombosis. Do you think there was any relation between the death of Andino and the labor that he was realizing that day? A. In all heart trouble, especially in those related with the circulation of the heart, any kind of physical effort is dangerous to the heart. Not only the physical effort, but too much food, heavy meals, and even medical literature gives cases of heart trouble of circulatory origin, that in emotional states, die of coronary thrombosis or angina pectoris, but the most dangerous thing to a bad heart with an organic lesion is a physical effort. A normal heart has a reserve capacity so that the heart is compensated, and in a bad heart, for example a heart having aortitis with aortic insufficiency, this reserve capacity does not exist or is less, much less than in a normal heart, and any physical effort can cause trouble. This man could have died in his house; during breakfast or making any effort which can cause or precipitate his heart trouble, and the same thing if he plays poker. We cannot specifically say just what the immediate cause was.

"Q. But now, doctor, talking in terms of probability, was it probable that under the circumstances this man was working and the effort he was realizing, that his pre-existing heart condition had been aggravated and the cause of his death precipitated by the work he was doing? A. Yes, I can assure both things in that man and in any other heart patient.

"Q. Doctor, was it also probable that this man, walking that same morning from his house to the job could have died of the same cause with the same precipitation? A. I answered that question. He could have died taking the breakfast or in any other way; as greater the effort, greater the probability, and he can die being just walking from his home to his work. That is in accordance with the effort.

"Q. So you do not know what reserve capacity he had? A. I can assure he had very little or none.

"Q. So you assume positively that he had very little or none, so he was very ill of his heart. A. Not very ill. The heart diseases are compensated or not compensated, but he had a serious trouble but compensated, which means he could work.

"Q. How can you state that this trouble is compensated? A. Clinically.

"Q. But how can you appreciate that clinically? A. Because there are signs. In the heart that is not compensated it has a murmur or other signs. Heart insufficiency.

"Q. Do you think that in order to determine without failure or mistake the actual cause of death and the actual condition of the heart of this man, a postmortem was necessary? A. No, a postmortem would only corroborate.

Dr. Ramos testified further than Andino could have died playing poker or while having dinner, or walking or turning himself to the other side in bed or by falling from the bed to the floor. The following question was asked by Deputy Commissioner Donovan:

"Q. Dr. Ramos, in your record, you have stated that there was edema in the lower extremities, was that marked edema? A. No, not very remarkable.

"Q. What would that condition suggest to you? A. That suggests a heart failure. That the heart has not sufficient strength and the blood coming from the lower extremities has some difficulty in going to the heart."

Dr. Manuel Janer, a member of the medical staff of the Municipal Hospital at Rio Piedras, testified in part, as follows: that he is the surgeon of the hospital and was called to see Susano Andino on January 8, 1946 and found that he had a gastric pain; that there was a possibility that he might have an acute abdomen but after examining him found he had loose muscles and left word with the nurse that there was no need of surgery at that time and that he did not reach any diagnosis because he was called to do surgery if necessary, and there was no necessity for surgery. The Doctor further testified that a diagnosis of coronary thrombosis can not be made just by seeing the patient; that there has to be a more definite examination, for instance, by the use of the stethoscope, cardiograph, X-rays, laboratory. He further testified that a great number of doctors will certify that a person dies of coronary thrombosis without being certain and states further that one cannot make a diagnosis of a person dying of coronary thrombosis unless you take X-rays or unless an autopsy is performed or unless a cardiograph is taken and even taking an autopsy, a person cannot be sure.

The petitioner seemingly contends that in view of the testimony of Dr. Ramos, the Deputy Commissioner should have found that the coronary thrombosis of which Andino died was precipitated by the hard labor he was performing and argues strenuously that the Deputy Commissioner made no specific finding to this effect.

There is testimony that might have sustained such a finding, as Dr. Ramos testified that there was a relation between the death of Andino and the labor he was realizing that day. The evidence as a whole, however, does not compel such a finding, and the Deputy Commissioner found that "he died of coronary thrombosis" and "that prior to, during and subsequent to the collapse, the employee did not sustain an injury arising out of and in the

course of his employment"; Which, of course, includes the query whether there was an aggravation by injury resulting in disability from the pre-existing condition. See Hoage v. Employers' Liability Assur. Corporation, 62 App.D.C. 77, 64 F.2d 715, 717.

In Speaks v. Hoage, 64 App.D.C. 324, 78 F.2d 208, 210, the employee Speaks after carrying a can of gasoline weighing between 30 and 35 pounds about a distance of 240 feet was found lying on the floor of his employer's premises apparently in pain; at a hospital he died two days later. It was claimed that the exertion in carrying the gasoline subjected Speaks' heart to a strain which was a contributing cause to his death. The deputy commissioner found that the employee was suffering from a long-standing disease of the heart and that his death was caused by that disease; that the evidence failed to establish that he suffered sufficient strain while at work to bring about the acute condition of the heart which caused his death. In that case the deputy coroner of the District testified that "the cause of death was a cardial renal hepatic disease; that is, a disease of the heart, kidneys, and liver, advanced in type, associated with the terminal conditions of an acute cardiac dilatation. * * * The man was dead walking around." In affirming the decree of the lower court sustaining the deputy commissioner's rejection of the widow's compensation claim, the court says: "We think that there is substantial evidence tending to prove that the death of the employee resulted from an acute attack of a long standing and fatal heart disease and that the onset was not caused in whole or in part by any work performed by him." See also Hoage v. Liberty Mutual Insurance Co., 64 App.D.C. 395, 78 F.2d 874.

The Court is not unmindful of the holding in Commercial Casualty Ins. Co. v. Hoage, 64 App.D.C. 158, 75 F.2d 677, in which case the claimant, a grocery store clerk, who was unaware of having an enlarged heart suffered aortic regurgitation which was precipitated by strenuous exertion in handling sacks of potatoes and which condition in turn caused death.

In the present case, however, the findings of the Deputy Commissioner are "that the deceased died of coronary thrombosis and that prior to, during and subsequent to the collapse, the employee did not sustain an injury arising out of and in the course of his employment"; which includes the query whether there was an aggravation by injury resulting in death or disability from the pre-existing condition. Hoage v. Employers' Liability Assur. Corp., supra.

The findings of the Deputy Commissioner are broad, nevertheless, they should be construed liberally and if possible should be so construed as to give a rational meaning to the findings. The construction should be in the light of the issues before the Deputy Commissioner, the evidence adduced at the hearing and his decision of the claim. The testimony shows that the employee suffered from a chronic heart disease for many years and that he collapsed while attempting to bar a heavy stone. It is thus clear that the issue decided by the Deputy Commissioner was whether the employee's efforts in barring the stone aggravated the chronic heart condition to the extent of precipitating the onset of the thrombosis from which he died. The Deputy Commissioner's decision rejecting the claim can only mean that his broad language imported a finding that the strain of barring the stone did not aggravate the pre-existing heart ailment nor did it precipitate the collapse.

The Court, therefore, holds that there is substantial evidence that the death of the deceased resulted from an acute attack of chronic heart disease from which he had suffered for many years and that the collapse or onset was not caused by the work he was performing at the time of his collapse.

The motion to dismiss the bill of injunction will be granted.